# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL GOLODNER,<br>    Plaintiff,<br><br>v.<br><br>ALBERT MARTINEZ, DANIEL KENYON, and<br>JAMES BEE,<br>    Defendants. | No. 3:15-cv-1515 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Following their romance, the relationship between Daniel Golodner and Linnette Baez Rivera soured, and they secured court orders of protection against each other. When they both thereafter made complaints to Groton Town police officers about each other, the defendant officers allegedly refused to investigate Golodner's claims against Baez Rivera while thoroughly investigating her claims against him. Golodner alleges that this amounted to the defendants' taking his claims less seriously than those from similarly situated women and that this treatment was motivated by discriminatory animus based on gender in violation of his Fourteenth Amendment right of equal protection. The defendants have moved for summary judgment. They argue that the undisputed material facts show that they did not discriminate against Golodner on the basis of his gender. For the reasons that follow, I agree.

**I.    Background[1]**

After they stopped dating, Golodner and Baez Rivera both secured court orders of protection against each other. (ECF Nos. 25-2 at ¶¶ 1, 2, 7, 25-3 at 7, 26-1 at 1 ¶¶ 1, 2, 7.) Specifically, Golodner obtained two orders of protection from the Superior Court at New London:

---

[1] The following facts are taken from the defendants' Local Rule 56(a) statement (ECF No. 25-2) and the plaintiff's Local Rule 56(a) statement (ECF No. 26-1). Additional facts are taken from the record as necessary. Unless otherwise stated, the facts are undisputed.

1

(1) a civil order of protection, on October 17, 2014, which protected him from assault, harassment, following, interfering, or stalking by Baez Rivera; and (2) a criminal order of protection, on November 10, 2014, which protected him from contact, assault, threatening, abuse, harassment, following, interference, or stalking by Baez Rivera and ordered her to stay 100 yards away from him at all times. (ECF No. 26-1 at 4–5, ¶¶ 1–2.) The criminal order of protection also included a direction that Baez Rivera was not to "contact the protected person[, Golodner,] in any manner, including written, electronic or telephone contact, and . . . not [to] contact [his] home, workplace or others with whom the contact would be likely to cause annoyance or alarm to [him]." (ECF No. 26-4 at 2.) Baez Rivera also secured a protective order against Golodner, ECF No. 25-3 at 7, but that document is not part of the summary judgment record.

On October 13, 2014, Baez Rivera reported to the Groton Town Police Department (GTPD) that her vehicle had been vandalized. (ECF No. 25-7 at ¶ 4.) Officer Jason Urian, who is not a defendant, investigated this complaint. (ECF No. 25-7 at 5.) He visited the scene and observed several deep scratches on her vehicle, a shattered right mirror, and a deflated right front tire. (*Id.* at ¶ 4.) Baez Rivera stated that she believed that either one of two men was responsible. She had previously dated both of them, and she had secured protective orders against both. (*Id.*) One of them was Daniel Golodner. (*Id.*) Baez Rivera did not make a claim that Golodner had violated her protective order. Instead, she reported damage to her vehicle, Urian instituted a criminal mischief investigation, and Baez Rivera gave Urian the names of the two men, one of whom she believed was responsible. (*Id.*, ECF No. 25-7 at 5.) Urian called both men, and he spoke with Golodner the next day. (*Id.* at ¶ 5.) Golodner stated that he had nothing to say. (*Id.*)

On October 16, 2014, Urian took a complaint from Golodner, who stated that he had a protective order against Baez Rivera that she had violated by sending him an offensive email. (ECF

2

No. 25-7 at ¶ 6.)[2] Golodner provided a copy of the email. (*Id.*, ECF No. 25-7 at 12.) After speaking with Baez Rivera, Urian applied for an arrest warrant for Baez Rivera for violation of Conn. Gen. Stat. Section 53a-223b, Violation of a Restraining Order, and called Golodner to tell him that. (*Id.* at 14.)

On December 18, 2014, Baez Rivera again reported to the GTPD that her car had been damaged. (ECF Nos. 25-2 at ¶ 27, 25-5 at ¶ 5, 26-1 at ¶ 27.) Again, she did not claim that Golodner had violated her protective order. (ECF No. 25-5 at ¶¶ 1–7.) Officer Martinez, after responding to the report of criminal mischief, observed physical damage to the gas cap of Baez Rivera's car and several scratches on the car. (ECF Nos. 25-5 at 7, 9.) According to Martinez's incident report, "[w]hen asked who could have done this, Baez named [another man] and Daniel Golodner as possible suspects." (ECF No. 25-5 at 9, *see also* ECF Nos. 25-2 at ¶ 28, 26-1 at ¶ 28.) She told Martinez she had had extra-marital affairs with both men in the recent past, and that she had a protective order against Golodner. (ECF No. 25-5 at ¶ 9.) Martinez investigated both men. (ECF Nos. 25-2 at ¶ 29, 26-1 at ¶ 29.) Golodner resented Martinez's questioning and felt that he was being harassed by this investigation. (ECF Nos. 25-2 at ¶ 30, 26-1 at ¶ 30.) Martinez explained to Golodner that he was doing his job and that he could not disregard Baez Rivera's information about potential suspects. (ECF Nos. 25-2 at ¶ 31, 26-1 at ¶ 31.) On December 20, 2014, Martinez returned a call from Golodner, and Golodner apologized for being abrasive on the phone in the past: he explained that he was frustrated and still had feelings for Baez Rivera. (ECF No. 25-2 at ¶ 32, 26-1 at ¶ 32.)

---

[2] It is unclear how Golodner was seeking to enforce a protective order that was not issued until the next day. (ECF Nos. 25-7 at ¶ 6, 26-3.) However, the defendants do not dispute that Golodner had a protective order on that day, and this issue does not affect the analysis.

On December 24, 2014, Martinez received an envelope from Golodner, which contained a handwritten note stating that it was a counter-complaint against Baez Rivera. (ECF Nos. 25-2 at ¶ 33, 26-1 at ¶ 33.) Later that day, Martinez spoke with Golodner. (ECF Nos. 25-2 at ¶ 34, 26-1 at ¶ 34.) Golodner stated that he was being "harassed" by the GTPD "via [Baez Rivera]'s false complaints." (*Id.*) Martinez again "explained that he had to investigate . . . Golodner, as well as the other man identified by [Baez Rivera]." (*Id.*) He told Golodner that he "did not have any information that the criminal mischief complaint . . . was false." (ECF Nos. 25-2 at ¶ 35, 26-1 at ¶ 35.) When Martinez asked how Baez Rivera was harassing Golodner in violation of the protective order, Golodner cited only the fact that she was filing complaints against him with the GTPD; he cited no instances in which she directly contacted him. (ECF No. 25-2 at ¶ 37, 25-3 at 8–11.)[3] Martinez did not commence an investigation of Baez Rivera. (ECF Nos. 25-2 at ¶ 38, 26-1 at ¶ 38.) Golodner was not arrested on the basis of Baez Rivera's complaint. (*Id.*)

On March 26, 2015, Golodner again contacted the GTPD. (ECF Nos. 25-2 at ¶ 42, 25-6 at ¶ 4, 26-1 at ¶ 42.) Golodner spoke with Officer Kenyon, and he once again expressed that he wanted to file a complaint against Baez Rivera for violating the protective order. (ECF Nos. 25-2

---

[3] In Golodner's deposition, he repeatedly states that the GTPD's actions in investigating Baez Rivera's complaints "annoyed and alarmed" him:

> Q. . . . Well, you know, you talk about all of these false complaints and then they contacted you in violation of this order. Can you give me any details about those false complaints?
> A. Okay. I'm not saying they contacted me in direct violation of the order because they're not listed. Their contacting me annoyed and caused me alarm, and that is what is in violation of that order. Had they not contacted me and had she not prompted them to contact me, I wouldn't have made a complaint for violation of the order.
> Q. So, again, the contact by the Groton Police Department violated this order; that's your claim?
> A. The contact by the Groton police because of her violated the order, correct.

(ECF No. 25-3 at 8.)

Golodner stated that Martinez's discussion with him relating to the car vandalism "annoyed and alarmed" him. (*Id.* at 11.) However, Golodner did not state in his deposition—nor does he point to any other evidence in the record to support—that he informed Martinez on December 24, 2014 of any direct contact that Baez Rivera had with him.

4

at ¶¶ 40–42, ECF No. 26-1 at ¶¶ 40–42.) "Golodner complained that police contacting him regarding criminal investigations he believed to be false is a violation of a protective order he has against [Baez Rivera]." (ECF No. 25-6 at 6.) But "[w]hen he lodged th[is] complaint . . . , [Golodner] admitted that he had no evidence that [Baez Rivera] was contacting him directly in violation of the protective order." (ECF Nos. 25-2 at ¶ 42, 26-1 at ¶ 42.)[4] Kenyon told Golodner that if an investigation indicated that any of Baez Rivera's complaints were false, she would be investigated and arrested if appropriate. (ECF Nos. 25-2 at ¶ 43, 26-1 at ¶ 43.) Golodner told Kenyon that he would sue the department for not hearing his complaint and left "upset and shouting obscenities." (ECF Nos. 25-2 at ¶ 44, 26-1 at ¶ 44.) Golodner states that Kenyon refused to take his complaint, laughed at him and mocked him, and was rude, condescending, and disrespectful. (ECF No. 26-2 at 3.)

Golodner states that, in all, he was contacted at least ten times by the GTPD to investigate Baez Rivera's "false complaints" against him, although he provides no details about these complaints and does not specify how many of them involved the three defendants. (ECF No. 26-2 at ¶ 4.) He also states that he spoke with Lieutenant Bee of the GTPD "about defendant Martinez's refusal to investigate his complaint and [that] defendant Bee refused to entertain the complaint."

---

[4] Golodner admitted this fact in his Local Rule Statement. (ECF No. 26-1 at 4, ¶ 42.) And, although he contradictorily claims in his brief that Kenyon ignored Golodner's complaint that Baez Rivera was calling Golodner directly in violation of the protective order, his testimony does not support that assertion:

> Q. . . . Did you have any evidence that [Baez Rivera] was contacting you directly [when you spoke to Officer Kenyon]?
> A. Not – that didn't happen until after that.
> Q. Okay. So it was just that law enforcement was contacting you?
> A. No. There's – I had a written statement listing a lot of reasons that violated the protective order.
> Q. But you had no evidence that she was contacting you directly?
> A. I'd have to reread my statement. I don't recall, but I know a large portion of it was my being constantly alarmed and annoyed *because of the police contact*.

(ECF No. 25-3 at 13) (emphasis added).

(ECF No. 26-1 at 5, ¶ 5.) Golodner claims that Baez Rivera called him and told him "she knew the defendants would not do anything to her if she violated the protective orders against her." (ECF Nos. 26-1 at 5, ¶ 8, 26-2 at ¶ 12.) Golodner does not present any evidence that he reported this phone call to the defendants.

**II.     Legal Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving parties—here, the defendants—bear the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (internal citations and alterations omitted).

If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The Court considers all facts "in the light most favorable to the nonmoving party"—here, the plaintiff—after drawing "all reasonable inferences in his favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000) (quotation marks omitted).

### III. Analysis

The Fourteenth Amendment's Equal Protection Clause directs that "all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 339 (1985). Golodner alleged that the defendants violated his equal protection rights by responding less favorably to him—when he filed a complaint for violation of a protective order—than to Baez Rivera. The defendants argue that Golodner has failed to produce any evidence from which a reasonable juror could infer that he was treated differently than any similarly situated female complainants or that the defendants took any actions against him with discriminatory intent based on his gender. After drawing all reasonable inferences from the record in favor of the plaintiff, I agree with the defendants.

Golodner characterizes his claim as an allegation that the defendants discriminatorily failed to protect him, rather than a claim of selective prosecution or investigation, and I will accept that characterization for the purposes of the defendants' motion, as it entails a standard more favorable to Golodner. *See Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004). "The state may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n. 3 (1989). Plaintiffs pursuing denial of protective services claims "are not required to plead similarly situated comparators." *White v. City of New York*, 206 F. Supp.3d 920, 931 (S.D.N.Y. 2016) (citing *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("[A] plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in several ways. . . . It is unnecessary for the plaintiffs to allege or show either an express racial classification . . . or the existence of better treated, similarly situated persons of a different race.")).

But "[p]roof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause," even in cases where comparators are not required. *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 438 (2d Cir. 2009) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). "*Any* equal protection claim is grounded on a comparison between the treatment the state gives similarly situated individuals." *Id*. at 439 (emphasis added). Where a plaintiff did not "attempt[] to show that she *and other women* were discriminated against by defendant police departments, . . . at the very least she has to show that it was her gender, and not some other characteristic, that motivated the treatment she received." *Id.* (emphasis in original). In fact, "[s]howing that one officer or even the police department as a whole acted slowly in response to [a plaintiff's] complaints is not sufficient, in and of itself, to show discriminatory intent." *White*, 206 F. Supp.3d at 931–32 (internal quotation marks and alteration omitted). "Nor do [a plaintiff's] allegations that [defendant] officers deviated from . . . guidelines by declining to take his complaint support an inference of discriminatory intent on their own." *Id.* at 931–32 (dismissing claims against certain officers who were allegedly "not as responsive to White's concerns as he wishes they had been" where plaintiff "did not offer specific facts supporting an inference that those officers were motivated by discriminatory animus" and citing *Okin*, 577 F.3d at 438–39).

  A. <u>Defendants Kenyon and Martinez</u>

Viewing the evidence in the record in the light most favorable to Golodner, I find no evidence to support a finding that these defendants acted with discriminatory intent based on his gender. At most, the evidence suggests that Martinez and Kenyon refused to investigate his complaints that Baez Rivera was violating a protective order by making false complaints to the police about him—and Kenyon laughed at and was rude to him—while Martinez and another

8

GTPD officer (who is not a defendant) investigated her complaints identifying him as a possible suspect in vandalizing her car. Although Golodner's criminal order of protection does state that Baez Rivera must not contact "others with whom the contact would be likely to cause annoyance or alarm to the protected person" (ECF No. 26-4 at 2) and although Golodner claims Baez Rivera's contact with the GTPD annoyed and alarmed him, declining to take a complaint is insufficient, on its own, to show the discriminatory intent necessary for an equal protection violation, and there are no facts suggesting that Kenyon's allegedly boorish conduct was based on Golodner's gender.[5] *White*, 206 F. Supp.3d at 931–32. It is not an equal protection violation to fail to take allegations seriously, and there is no indication that Kenyon's alleged rudeness was gender-based.

Golodner presents no other facts to support a conclusion that discriminatory intent motivated the treatment that he received. Instead, even when it is construed in the light most favorable to Golodner, the evidence makes clear that the defendants treated Golodner differently from Baez Rivera because, while she showed the police evidence that her car had been vandalized and identified him as a possible suspect, he provided them (1) no evidence that a crime had been committed, (2) no evidence the complaints that she made against him were false, (3) and no evidence that she had violated the protective order, under a reasonable interpretation of its terms. In other words, the undisputed facts show that the defendants treated Golodner's and Baez Rivera's complaints differently based on the content of those complaints and the supporting facts, not on the gender of the complainant.[6] When Baez Rivera presented both Urian and Martinez with

---

[5] Kenyon's incident report states that "Golodner has called this department several times looking for officers to entertain his complaint," (ECF No. 25-6), and Golodner avers that Kenyon told Golodner that he was "cop shopping." (ECF No. 26-2 at 3.) Thus, to the extent the record suggests anything about the reasons for Kenyon's alleged rudeness, it suggests that he was reacting to Golodner's persistence. It does not, in any event, suggest a gender-based animus.

[6] The clear differences in the facts surrounding the complaints by Baez Rivera and those by Golodner make this case easily distinguishable from *Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998), on which Golodner relies. In *Myers*, the Second Circuit held that a police department's "first-come, first-served" policy with regard to investigating complaints—and apparent refusal to investigate later complaints made by the target of an earlier complaint—violated

9

evidence of damage to her car—supporting a criminal mischief complaint—those officers investigated the allegations. (ECF Nos. 25-5 at 9; 25-7 at 7.) Similarly, in October 2014, when Goloder presented evidence that Baez Rivera contacted him in violation of a protective order, Urian (although not a named defendant) investigated Golodner's complaint and applied for an arrest warrant for Baez Rivera on related charges. (*See* ECF No. 25-7.) Martinez, on the other hand, did not act on the complaint Golodner brought to him because Golodner cited no instances of direct contact from Baez Rivera that would have violated the protective order. (ECF No. 25-2 at ¶ 37, 25-3 at 8–11.) Similarly, Kenyon did not act on the complaint that Golodner brought to him because "[w]hen he lodged th[is] complaint . . . , [Golodner] admitted that he had no evidence that [Baez Rivera] was contacting him directly in violation of the protective order." (ECF Nos. 25-2 at ¶ 42, 26-1 at ¶ 42.)

Further, the officers' apparent view that Baez Rivera's complaints to the police about the vandalism to her car and about Golodner's being a possible suspect did not violate the protective order against her was reasonable. There was no evidence that the officers were aware that the complaints were false, and construing a protective order to prohibit the making of complaints (not obviously false) to the police about allegedly criminal conduct by a third person would raise serious First Amendment problems. *See Brown v. Town of Stonington*, 3:01CV2374 (CFD), 2008 WL 2856663, at *5 (D. Conn. July 22, 2008) ("Brown's police complaint was a petition for redress of grievances and thus was constitutionally protected."); *cf. Lynch v. Ackley*, 811 F.3d 569, 580 (2d Cir. 2016) (granting qualified immunity to police chief where her allegedly retaliatory actions themselves took the form of speech: "[T]here was no clear law as to whether [the Chief's] allegedly

---

the Equal Protection Clause: "'[T]he factual pattern rather than who complains first properly guides subsequent police or prosecutorial investigation or action.'" *Id.* at 75 (quoting district court's decision). As shown, the "factual pattern" here accounts for the different handling of the complaints made by Baez Rivera and Golodner.

retaliatory actions constituted *prohibited* retaliation because [her] alleged retaliatory acts were limited to her exercise of her own First Amendment right to defend herself against [plaintiff's] attacks."). As such, even if there was a constitutional violation, the defendants would at least be entitled to qualified immunity for failing to investigate whether the making of complaints to the police violated the protective order.

Finally, although Golodner states in his interrogatory responses that Baez Rivera made "many false complaints" (ECF No. 26-2 at ¶ 9), Golodner has presented no evidence that Martinez and Kenyon were aware, or should have been aware, that Baez Rivera's complaints were false. Indeed, he has presented no evidence that the complaints were actually false. While he claims they were "false" in a general way, he does not claim that Baez Rivera's car was not vandalized, and the defendants have submitted uncontroverted evidence that it was. (ECF Nos. 25-5 at 9, 25-7 at 7.) Nor has Golodner done anything to suggest that the remainder of Baez Rivera's complaint to Martinez (the only defendant who investigated a complaint by her, as far as the record shows) was false. When Martinez asked Baez Rivera "who could have done this"—referring to the damage to the car on December 18, 2014—Baez Rivera identified Golodner and another man as "possible suspects" and stated that she had recently concluded extramarital affairs with both men. (ECF No. 25-5 at 9.) Golodner has submitted no evidence that Baez Rivera's identification of him as a "possible suspect" in response to a question by the police was a false statement, and he has not contested the evidence that he was at one time involved in a relationship with Baez Rivera. (*See* ECF No. 26-2 at 3) (Golodner's interrogatory responses referring to "my EX GF Linnette Baez Rivera".) Therefore, I grant summary judgment on all claims against defendants Martinez and Kenyon.

B. Defendant Bee

Although defendant Bee briefed the issue of supervisory liability in the motion for summary judgment, Golodner did not address that issue in his opposition brief: therefore, any theory of supervisory liability is abandoned. *See Packer v. SN Servicing Corp.*, 250 F.R.D. 108, 112 (D. Conn. 2008) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned.").

Instead, Golodner states in his opposition brief that his claim against Lieutenant Bee is based on Bee's personal involvement in equal protection violations. (ECF No. 26 at 6.) But Golodner has presented no evidence that discriminatory intent motivated Bee's actions. Golodner states that Bee refused to hear his complaints that Martinez and Kenyon had refused to investigate his allegations against Baez Rivera and that Bee told Golodner that his complaint "did not have probable cause." (ECF No. 26-1 at 4.) Again, an allegation that a police officer failed to take a complaint is insufficient, on its own, to support a finding of discriminatory intent. *White*, 206 F. Supp.3d at 931–32. And, as shown above, to the extent Bee told Golodner that his complaint about false complaints by Baez Rivera lacked probable cause, he was likely correct. In any event, Golodner points to no facts that suggest Bee's actions were motivated by Golodner's gender. The facts, as stated before, show that Golodner's complaints were treated by the GTPD officers appropriately based on the evidence that Golodner was or was not able to provide.

**IV.  Conclusion**

For the reasons stated above, the (ECF No. 25) Motion for Summary Judgment is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED.

   /s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
December 21, 2017